1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

JONI DIOQUINO,

Plaintiff,

v.

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

Defendant.

Case No. 20-cv-00167-BAS-RBB

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Plaintiff Joni Dioquino brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA").  She seeks short-term disability ("STD") and long-term disability ("LTD") benefits under two employee benefit plans funded by Defendant United of Omaha Life Insurance Company.  United filed an Administrative Record (ECF No. 45), and the parties filed opening and responding cross-trial briefs (ECF Nos. 46–48, 52).  Each party also filed an objection and a response concerning what material the Court may consider at trial.  (ECF Nos. 53, 55, 57–58.)  The Court then held a bench trial.  (ECF No. 59.)

After evaluating the evidence and considering the oral argument of counsel, the Court resolves the parties' objections and renders the findings of fact and conclusions of law set forth below.

//

## OBJECTIONS

### I.     Dioquino's Objection

Dioquino objects to certain items United included in the Administrative Record for the bench trial, specifically AR 833 through AR 1025.  (Pl.'s Obj. 1, ECF No. 53.)  United responds to the objection.  (ECF No. 57.)

Dioquino filed this lawsuit seeking both STD and LTD benefits without having filed an administrative LTD claim with United.  Therefore, after Dioquino sued, United opened an LTD claim on her behalf.  (AR 834–35.)  United asked Dioquino to complete a health questionnaire and provide updated medical records.  (AR 834.)  United also reached out to Dioquino's past employer for any updated payroll information.  (AR 882–900.)  Phillip Sourinho, an HR Business Partner for Rady Children's Medical, confirmed that Dioquino was medically separated in 2018.  (AR 889.)  Then the following email exchange occurred:

> Janet Ethofer (United):   For Joni's occupation, which was an account[ant]/financial analyst, if she was still working, would she be able to elevate her leg while working at her occupation?
>
> Phillip Sourinho:  It's a desk job, so I would say that is possible.

(AR 886.)  There are several other items in the objected-to portion of the Administrative Record, including a social media report (AR 934–73) and an updated internal spreadsheet/call log that tracks United's handling of the LTD claim (AR 1015–25).

Dioquino argues United manufactured the post-litigation LTD claim to support its defense.  (Pl.'s Obj. 5–9.)  She also argues these record items are irrelevant because United did not review them when it resolved Dioquino's STD claim.  (*Id.*)

"Judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 (9th Cir. 2009).  "In the ERISA context, the 'administrative record' consists of 'the papers the insurer had when it denied the claim.'"  *Id.* at 632 n.4 (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1086 (9th Cir. 1999)).

20cv0167

Extrinsic evidence may be considered "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (emphasis omitted).   These limited circumstances include where "there is additional evidence that the claimant could not have presented in the administrative process." *Id.*   "[A] district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 944 (9th Cir. 1995).

The Court sustains Dioquino's objection.   Dioquino's lawsuit challenges United's decision to deny her STD benefits.   She then seeks to use this denial to also show that submitting an LTD claim would have been futile, allowing her to seek LTD benefits in this action.   "The futility exception is 'designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail.'" *A.F. v. Providence Health Plan*, 157 F. Supp. 3d 899, 909 (D. Or. 2016) (quoting *Diaz v. United Agr. Emp. Welfare Ben. Plan & Tr.*, 50 F.3d 1478, 1485 (9th Cir. 1995)).   Meaning, whether her LTD claim was "demonstrably doomed to fail" should normally be determined based on the administrative record before the lawsuit was filed.   This approach is fair to both parties.   A plaintiff like Dioquino should not invoke the futility exception unless there is convincing evidence to support it. Conversely, the futility exception would make little sense if a defendant could evade it by unilaterally opening a new LTD claim only after litigation commences.

Hence, the Court adheres to the default rule and limits the Administrative Record to the items gathered before the lawsuit.   *See Montour*, 588 F.3d at 632 n.4; *see also Abate v. Hartford*, 471 F. Supp. 2d 724, 732 (E.D. Texas 2006) ("The administrative record consists of the 'relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it.'" (citing *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir. 1999))).

20cv0167

## II.     United's Objection

United objects to Dioquino's declaration filed in support of her Responding Trial Brief (ECF No. 52-1).   (ECF No. 55.)   In her declaration, Dioquino provides more information about the history of her ailments and other items not found in the Administrative Record, including Dioquino's specific claim that in 2018, Mr. Sourinho "confirmed that [my employer] was unable to accommodate me" given "the manner in which I had to elevate my leg."  (Dioquino Decl. ¶ 7.)

United argues Dioquino had every opportunity to submit this information to the insurer beforehand, so none of the Ninth Circuit's exceptions for allowing additional evidence apply here.  (United's Obj. 3.)  Further, United raises various specific evidentiary objections to the declaration, including hearsay and lack of foundation for the attached exhibits.  (*Id.* 4–5.)  Dioquino responds to United's objection.  (ECF No. 58.)

The Court sustains this objection for two reasons.  First, Dioquino concedes that if the Court "does not allow consideration of the LTD AR"—the material addressed by the objection above—"then Ms. Dioquino's declaration is irrelevant."  (Dioquino's Resp. to Obj. 2.)   Because the Court has sustained Dioquino's objection, the Court similarly excludes this material because she concedes it is irrelevant.  Second, regardless, the same rules provide this material should not be considered.  Dioquino offers no reason why this information could not have been submitted before she filed suit.  Therefore, the Court also excludes her declaration on this basis.  *See Mongeluzo*, 46 F.3d at 944 ("[A] district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator.").

### FINDINGS OF FACT[1]

### The Disability Benefits Plans

1.     In 2013, Plaintiff Joni Dioquino started working for Children's Physicians Medical Group, Inc. ("Children's Medical").  (AR 195.)

---

[1]  To the extent that a finding is characterized as one of law but is more properly characterized as one of fact (or vice versa), substance will prevail over form.

20cv0167

2.      Dioquino participated in two employee welfare benefit plans that her employer sponsored: a short-term disability benefits plan ("STD Plan") and a long-term disability benefits plan ("LTD Plan").  The policy that funds the STD Plan is Policy No. GUG-AZ46.   (AR 1–40.)  A separate policy, Policy No. GLTD-AZ46, funds the LTD Plan.  (AR 789–832.)

<u>Short-Term Disability Plan</u>

3.      The STD Plan provides disability benefits for a maximum of eleven weeks.  (AR 18.)  Although the plan provides benefits for both partial and total disability, this dispute centers on the benefits for total disability.  (Compl. ¶¶ 7, 10, ECF No. 1.)

4.      *Total Disability*.  A plan participant like Dioquino is "Totally Disabled" when she is "unable to perform, with reasonable continuity, the Substantial and Material Acts necessary to pursue [her] Usual Occupation" because of "an Injury or Sickness."  (AR 33.)  "Substantial and Material Acts" are "the important tasks, functions and operations generally required from employers" in the employee's Usual Occupation "that cannot be reasonably omitted or modified."  (*Id.*)  And the employee's "Usual Occupation" is "any employment, business, trade or profession and the Substantial and Material Acts of the occupation [she was] regularly performing for the Policyholder when the Disability began."  (AR 34.)

5.      *Elimination Period*.  An employee who becomes disabled is not immediately entitled to benefits.  Rather, the employee must first satisfy the "Elimination Period," which is a minimum "period of continuous Total or Partial Disability."  (AR 32.)  The STD Plan's Elimination Period is fourteen calendar days.  (AR 18.)  Therefore, an employee can first start receiving benefits only after fourteen days of continuous disability.  (AR 24.)

6.      *Benefits*.  Assuming an employee is disabled and satisfies the Elimination Period, the STD Plan provides a "Weekly Benefit" that is the lesser of: (a) 70% of the employee's weekly earnings, less "Other Income Benefits," or (b) "the maximum Weekly Benefit, which is $2,000, less Other Income Benefits."  (AR 18.)  The "Other Income

Benefits" that offset the Weekly Benefit include state government disability benefits. (AR 19.)

7.    *Claims Procedure*.  The STD Plan requires an employee to submit written proof of loss in order for a claim for benefits to be considered.  (AR 27.)  An employee satisfies this requirement by submitting either a completed claim form or a written statement that includes the cause of the disability, treating physician contact information, and any restrictions and limitations preventing the employee from performing job duties. (*Id.*)  Consistent with ERISA regulations, the STD Plan requires United to evaluate the claim within a set period.  (*Id.*)  If United denies the claim, it must provide notice of the denial, including "specific reason(s) for the denial" and a "reference to specific Policy provisions on which the denial is based."  (AR 29.)  The employee has a right to appeal the claim decision within 180 days, and United must again respond to the appeal within a set period.  (AR 30.)

## Long-Term Disability Plan

8.    Whereas the STD Plan provides benefits for up to eleven weeks, the LTD Plan provides benefits for a participant like Dioquino until potentially up to her Social Security retirement age.  (AR 807.)  The LTD Plan similarly provides benefits for partial and total disability, but the focus here remains on its total disability benefits. (Compl. ¶¶ 8– 10.)

9.    *Total Disability*.  The LTD Plan's "Total Disability" definition is two-phased. For the first two years, a Total Disability is materially the same as under the STD Plan.  An employee is totally disabled when an illness prevents her from doing the Substantial and Material Acts necessary to pursue her Usual Occupation.  (AR 825.)  After two years of benefits, the definition becomes more stringent.  An employee is totally disabled only if she cannot perform any reasonable occupation in light of her "age, education, training, experience, station in life, and physical and mental capacity."  (*Id.*)

10.   *Elimination Period*.  The LTD Plan likewise includes a waiting period before an employee is entitled to benefits.  (AR 823.)  The "Elimination Period" is the later of: (a)

"90 calendar days," or (b) the date . . . short-term disability payments under the Policyholder's insured or self-insured group plan end." (AR 806.)

11.   *Benefits*.  Assuming an employee is totally disabled and satisfies the ninety-day Elimination Period, the LTD Plan provides for a monthly benefit that is the lesser of: (a) 60% of the employee's gross monthly pay, less Other Income Benefits; or (b) $6,000, less any Other Income Benefits.  (*Id.*)

12.   *Claims Procedure*.  The LTD Plan has the same claims procedure as the STD Plan.  (*Compare* AR 815–18, *with* AR 30–33.)  The employee must submit a written claim, United must respond, and the employee has the right to appeal an adverse decision within 180 days.  (AR 818–21.)

### Dioquino's Short-Term Disability Claim

13.   In early November 2018, Dioquino submitted her STD claim and represented that she became disabled on August 20, 2018.  (AR 770.)  Dioquino claimed she could not perform her occupational duties as an Accountant–Financial Analyst because she was "unable to sit for [a] period of time and must be able to elevate [her] legs." (*Id.*)

14.   Children's Medical provided an occupational Position Description reflecting that Dioquino's job was sedentary and required her to "compile, analyze and validate reports of financial data." (AR 774.)

15.   As part of Dioquino's STD claim, Dr. Richard Campbell submitted an Attending Physician's Statement.  (AR 777–78.)  Dr. Campbell described Dioquino's functional capacity and functional restrictions as follows: "Needs to be able to elevate leg. Her employer unable to accommodate . . . . Elevate leg frequently.  Unable to sit/stand/walk > 10 mins. per hour.  Needs to get up from sitting freq[uently] for stretch break." (AR 778.)   He did not include further remarks or an anticipated treatment plan. (*Id.*)

16.   There is no evidence that Dr. Campbell ever communicated directly with Children's Medical.  Therefore, it appears that Dr. Campbell's statement that Children's Medical was "unable to accommodate" Dioquino's need to elevate her leg was based on Dioquino's representation to Dr. Campbell.

## Dioquino's Treatment Records

17.     United obtained Dioquino's medical records, but they reflect that she received relatively little medical attention or treatment when she reportedly became completely disabled in August 2018 and over the subsequent months.

18.     On August 23, 2018, Dioquino initially presented to her family physician, Dr. Shahed Samadi, complaining of left knee and heel pain, "without any known trauma or injury." (AR 494.) Dr. Samadi's musculoskeletal examination revealed "no deformity, normal range of motion, normal strength, no joint swelling, [and] [m]ild point tenderness of the left heel." (AR 495.) He advised Dioquino to "[c]onsider taking [a] thousand milligrams of Tylenol every 8 hours as needed for pain," to apply a topical pain relief cream to her knee, and to "[c]ontinue to use [her] cane as needed." (*Id.*)

19.     Dioquino next presented to Dr. Campbell, an occupational medicine physician, on August 29, 2018, reporting knee and Achilles heel tenderness. (AR 439.) Dr. Campbell wrote:

> Patient was thought to be coming in today for follow-up of hamstring injury [from 2015], but states that she is having pain to the knee and pain to the ankle region. She has not been seen previously for these issues. She states the knee pain began about 3 weeks ago. She does not recall any significant trauma or injury. The ankle symptoms began around the same time. Again, no injury or trauma. No numbness or tingling. No catching, locking, or instability.

(*Id.*) His physical examination showed a moderate joint effusion in the left knee, but "no ecchymosis or erythema" and "[n]o deformity." (AR 447.)

20.     Bilateral knee x-rays taken the next day revealed no acute fractures or dislocations but bilateral knee arthrosis—a type of arthritis. (AR 513.) The diagnostic also showed a "left knee joint effusion which can be seen with internal derangement." (*Id.*)

21.     Dioquino's next treatment date was on September 21, 2018, with internal medicine physician Dr. Corinne Yarborough, who noted that Dioquino's left lower extremity was "slowly improving with conservative measures." (AR 452.)

20cv0167

22.      Next, Dr. Campbell again saw Dioquino on November 8, 2018.  (AR 445.) He noted:

> Slowly improving.  Continues to have swelling to the left lower extremity especially if stands for any prolonged period of time.  Symptoms improve with leg elevation.  Employer not able to accommodate elevating the leg at work.  Ankle movement becoming less painful.  Left knee continues to be painful.

(AR 445.)  For treatment options, Dioquino "decline[d] [a] cortisone injection."  (AR 449; *but see also* AR 500 (noting "[c]ortisone injection considered, however patient is currently on Coumadin"—a blood thinner).  She "decline[d] formal physical therapy."  (AR 449.) She also "decline[d] [a] Cam Walker boot."  (AR 442.)  Dr. Campbell did not mention any consideration of surgery, and he did not refer Dioquino for further diagnostic tests, like an MRI.  (AR 445–53.)[2]

### United's Claim Review

23.      In January 2019, United's Nurse Consultant reviewed the available medical information and summarized her conclusions, in part, as follows:

> On exam the [claimant] had findings of an antalgic gait (using a cane), some tenderness of the Achilles, left knee effusion, crepitus, and -10 degrees knee extension.  The remainder of ROM's [range of motion], special testing, strength, and sensation were normal.  X-rays with some degenerative findings were documented.  However, other than seeing Occupational Medicine, there were no other referrals documented, no referrals to Orthopedics, and no further diagnostics such as an MRI were ordered.  The [claimant] declined PT, a cortisone injection, and a cam walker boot.  It is unclear how her conditions would improve without a higher level of care.  Further, if someone was in so much pain with swelling that they were unable to work one would expect them to accept treatment.

(AR 672.)

---

[2]  Dioquino again saw Dr. Campbell on January 2, 2019, but this treatment record contains few additional details.  (AR 469–70.)  Dr. Campbell noted state disability forms were updated online but did not opine further on Dioquino's functional restrictions.  (*Id.*)

24.     The Nurse Consultant also reasoned that although some claimed restrictions and limitations ("R&Ls") appeared to be supported (elevating the leg, avoiding prolonged sitting), those R&Ls were not expected to extend beyond two to three days after the onset of the conditions.  (AR 672.)  The Nurse Consultant therefore wrote a letter to Dr. Campbell dated January 8, 2019, asking whether he agreed or disagreed with her conclusion that Dioquino's lower extremity restrictions and limitations would not be expected to last beyond two or three days.  (AR 721–23.)  Dr. Campbell never responded to that letter.

25.     In February 2019, United arranged for all of the available medical information to be reviewed by an Independent Physician Consultant ("IPC"), Gregory Smith, M.D., an occupational medicine physician.  (AR 653–56.)  Dr. Smith described his findings and opinions as follows:

> For the period under review 8/15/18 and forward, the claimant had the non-traumatic onset of left foot/ankle pain and left knee pain and effusion.  The history was remarkable for an old (2015) left knee injury and the x-rays showed osteoarthritis of the PF joint on the left, and the exam showed left knee pain, 5-/5 weakness and effusion with localized tenderness at the left Achilles tendon.  This is only consistent with moderate functional limitations of the left lower extremity, only providing for use of cane, and some limitations on weightbearing and repeated use of the left leg.  These limitations were appropriate through the most recent exam of 11/8/18 when the exam findings in the knee and left Ankle were improving but were still present.

(AR 654.)

26.     Dr. Smith also opined that Dioquino could sit "constantly" and stand "occasionally" (*i.e.*, 30 minutes at a time, 3 hours a day) during an 8-hour workday.  (AR 654–55.)

27.     Based on all of the available information and the opinions of its Nurse Consultant and Dr. Smith, United determined that Dioquino was not disabled under the terms of the STD Plan, and it conveyed this determination to her in a letter dated March 7, 2019.  (AR 647.)

20cv0167

**Dioquino's Appeal of United's Determination**

28.     In June 2019, Dioquino appealed United's determination on her STD claim and submitted various medical records and reference materials from medical websites to United.  (AR 586–88.)  Dioquino did not submit an Attending Physician's Statement in support of her claim at that time or a letter from a physician certifying disability.  (*Id*.)

29.     In her appeal letter, Dioquino also claimed that the risks of surgery (which no physician had recommended at this point) and cortisone injections outweighed their potential benefits, and stated she did not need to go to physical therapy because she could "do exercises [she] learned in physical therapy two years back."  (AR 586–87.)  Also, Dioquino said an MRI was not needed because Dr. Campbell already had one.  However, the MRI study she was referring to was done on May 5, 2016, more than three years earlier.  (AR 587.)

30.     The medical records Dioquino submitted with her appeal in June 2019 were identical to the records she had previously given United, and none of the records reflected treatment or evaluation after her visit with Dr. Campbell on January 2, 2019.  Moreover, Dioquino apparently had not been seen by any physician since January 2019, because during a call in July 2019, Dioquino told United that the records she submitted with her appeal were "her most recent medical records."

31.     In August 2019, United arranged for the file to be reviewed by Carol Hulett, M.D., an orthopedic surgeon.  (AR 421–23.)  Dr. Hulett prepared a report in which she stated as follows: "clinical findings are limited despite multiple complaints.  None of the findings clearly indicate functional impairment.  Based on clinical exams, imaging, and job description there are no restrictions supported from 8/22/18-7/9/19."  (AR 422.)  Dr. Hulett added that Dioquino "has been taken off work completely and none of the clinical exams support this decision."  (*Id*.)

32.     By letter dated August 9, 2019, United told Dioquino that Dr. Hulett had concluded that there was no support for R&Ls that would prevent Dioquino from performing her regular job.  (AR 419–20.)  United provided Dioquino with a copy of Dr.

Hulett's report to provide her with "an opportunity to review and provide a written response" before United made its final determination on appeal. (*Id*.)

33.    In response, Dioquino submitted a letter dated August 22, 2019, in which she reiterated her diagnoses, submitted copies of medical records, and summarized her health history. (AR 246–02.) The bulk of the new medical documentation were certification forms submitted by Drs. Campbell and Yarbrough to the California Employment Development Department that did not contain any details of Dioquino's purported symptoms, functional capacity, or related objective findings. (*See* AR 270–85.) The certification forms include a query stating: "Check here to indicate patient's disability is permanent and you never anticipate releasing patient to return to his/her regular or customary work." (AR 160, 166, 169, 172, 175.) On each certification, the physician responded, "No." (*Id.*)

34.    As for clinical records and office notes, Dioquino did not submit any records other than lab reports and an ankle x-ray report, and the most recent of those records was dated February 7, 2019—six months earlier. (*See* AR 247.)

35.    Dr. Hulett reviewed Dioquino's letter and submissions on appeal and noted that the January 2019 ankle x-ray showed "posterior calcaneal spurring but no other pathology." (AR 244.) Dr. Hulett stated that the new information did not impact her prior findings and conclusions, and explained her reasoning as follows:

> The records provide more detail about the claimants (sic) lengthy complaints [but] they do no[t] alter my previous opinions. Based on very limited clinical findings on one occasion it remains my opinion that she was capable of working as of 8/22/18-7/9/19. She was seen for lumbar radiculopathy in 2016 but no abnormal clinical findings or imaging were documented.

(AR 244.)

27.    United determined that the information submitted on appeal did not show that Dioquino was disabled under the STD Plan. United therefore upheld its claim determination on her STD claim and notified Dioquino in a letter dated September 11, 2019. (AR 125–32.)

28.     Dioquino never filed a claim for LTD benefits with United.

**Dioquino's Lawsuit**

36.     In January 2020, Dioquino filed this lawsuit challenging United's STD claim determination and also alleging that she is entitled to LTD benefits.   (Compl. ¶¶ 1,8.) Regarding the LTD Policy, Dioquino alleged that "[United of] Omaha incorrectly determined that Ms. Dioquino was not entitled to STD benefits (and, by extension, LTD benefits)."  (*Id.* ¶ 1.)

37.     After the case did not settle at the Early Neutral Evaluation Conference, United decided to pay the STD benefits in dispute to Dioquino: $1,244.76.[3]  United's counsel explained this decision in a letter, writing:

> [T]his decision to pay the STD benefits is not an admission of liability by United and should not be construed as any concession by United regarding the merits of your client's claims.  Rather, United's claim determinations were reasonable and correct.  The decision to pay the STD benefits has been made because it makes no sense to continue to litigate a claim that is worth less than $1,300.

(Hess. Decl. Ex A., ECF No. 47-2.)

**CONCLUSIONS OF LAW**

**I.     Legal Standards**

**A.     Rule 52(a)**

The court holds a bench trial on the record to resolve actions seeking benefits under ERISA.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999).  When an action is "tried on the facts without a jury, . . . the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a).  And unlike on summary judgment, the court can resolve factual issues in favor of either party.  *Kearney*, 175 F.3d at 1095.

---

[3]  The amount of STD benefits in dispute is lower than one might expect because, as mentioned above, the STD Plan provides that state government disability benefits offset the plan's benefits, and Dioquino received those benefits from California.

20cv0167

**B.    ERISA**

The standard for reviewing a plan administrator's decision in an ERISA benefits action is either de novo or abuse of discretion.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  The parties agree that the de novo standard applies here. Under this standard, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Id.*  Hence, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295 (9th Cir. 2010).

When conducting this review, "the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294.  The claimant must prove "by a preponderance of the evidence that [s]he was disabled under the terms of the plan." *Armani*, 840 F.3d at 1163.

## II.    Long Term Disability Benefits[4]

**A.    Exhaustion of Administrative Remedies**

United renews and supplements its argument that Dioquino failed to exhaust her administrative remedies.  (United's Opening Tr. Br. 24:8–28:18; Resp. Tr. Br. 13:19–16:17.)  The Court evaluated this issue at summary judgment.[5]  (Summ. J. Order 10:4–14:24.)  There, United argued the Court should not entertain Dioquino's cause of action because her failure to file a separate claim for LTD benefits means she did not exhaust her remedies under the LTD Plan.  Dioquino responded that she was excused from doing so because exhaustion would have been futile.

---

[4]  On summary judgment, the Court determined Dioquino's STD claim is moot because United paid her the maximum amount of STD benefits she can recover.  (Summ. J. Order 8:10–9:7, ECF No. 39.) So, the Court must now resolve only her claim for LTD benefits.

[5]  The Court also evaluated United's argument that Dioquino lacks standing to sue for LTD benefits.  (Summ. J. Order 9:12–10:3.)  United renews this argument, too, but the Court rejects it for the same reasons.  (*See id.*; United's Opening Tr. Br. 21:6–24:7.)

20cv0167

"Quite early in ERISA's history," the Ninth Circuit "announced as the general rule governing ERISA claims that a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Diaz*, 50 F.3d at 1483 (citing *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir. 1980)). This requirement is not "explicitly set out in the statute," but "the exhaustion doctrine is consistent with ERISA's background, structure and legislative history." *Id.* The doctrine also "serves several important policy considerations, including the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise." *Id.* Therefore, "courts have the authority to enforce the exhaustion requirement in suits under ERISA, and . . . as a matter of sound policy they should usually do so." *Amato*, 618 F.2d at 568.

Because this requirement is prudential—and not jurisdictional—there are exceptions to the rule. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626–27 (9th Cir. 2008). The exception invoked in this case is "when resort to the administrative route is futile." *Id.* (quoting *Amato*, 618 F.2d at 568).

"The futility exception is 'designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail.'" *A.F.*, 157 F. Supp. 3d at 909 (quoting *Diaz*, 50 F.3d at 1485). Consequently, "bare assertions of futility are insufficient to bring a claim within the futility exception." *See Diaz*, 50 F.3d at 1485. And a plan's "refusal to pay" does not, by itself, show futility. *See id.* (*See also* Summ. J. Order 11:10–12:21 (discussing *Diaz*, 50 F.3d 1478, and *Burnett v. Raytheon Co. Short Term Disability Basic Benefits Plan*, 784 F. Supp. 2d 1170 (C.D. Cal. 2011).)

At summary judgment, the Court determined a reasonable factfinder could find Dioquino's LTD claim was "doomed to fail." *See Diaz*, 50 F.3d at 1485. When viewing the record in the light most favorable to Dioquino, the Court reasoned a factfinder could reach this conclusion based on several items. These items included the fact that: (1) United is the one resolving claims under both plans; (2) the STD Plan's definition of total disability

- 15 -

is materially the same as under the LTD Plan for the first two years of LTD benefits; (3) United denied Dioquino's claim on the merits for reasons that apply equally to a claim under the LTD Plan; and (4) United reaffirmed its denial on appeal after considering additional information that stretched well past the Elimination Periods for both STD and LTD benefits.  (Summ. J. Order 13:3–14:21.)

Dioquino incorrectly argues that the Court determined it was futile for her to file an LTD claim.  (Dioquino's Opening Tr. Br. 15, 17.)  The Court only determined that United could not prevail on this issue at summary judgment.[6]  Now, at the trial stage, the Court is no longer constrained by the summary judgment standard.  *See Kearney*, 175 F.3d at 1095. The issue, then, is whether the facts set forth above demonstrate Dioquino's claim was doomed to fail.

The Court concludes the futility exception does not apply.  Dioquino did not simply fail to exhaust her administrative remedies under the LTD Plan, she chose not to file an LTD claim altogether.  This decision appears to have been made for strategic reasons, but it was a risky one.  Dioquino is now limited to establishing she is totally disabled under the LTD Plan based on the scant medical evidence in this case submitted in connection with her STD claim.

Moreover, the only physician who submitted an Attending Physician's Statement to United did not respond to United's and its consultants' numerous follow-up inquiries.   In seeking LTD benefits, Dioquino could have provided more support from her attending physicians or other evidence that establishes her condition is disabling under the LTD Plan.

---

[6]  In some ERISA cases, particularly where the standard of review is an abuse of discretion, motions for summary judgment are used in lieu of a bench trial or Rule 52 motions to resolve the ultimate issue.  *See Josef K. v. Cal. Physicians' Serv.*, 477 F. Supp. 3d 886, 897 n.4 (N.D. Cal. 2020) (collecting cases).  Here, the standard of review is de novo, and the motion for partial summary judgment before the Court was not being used instead of a bench trial.  No administrative record had been filed.  Therefore, the Court applied the typical Rule 56 standard.  *Cf. Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999) ("Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 965 (9th Cir. 2006).

Finally, notwithstanding Dioquino's characterizations of United's claims handling process, the Court finds United fairly considered the STD claim. It accepted Dioquino's submissions, evaluated them along with other information, and sent Dioquino correspondence explaining its reasons for denying her claim. Further, when Dioquino appealed, United obtained an additional medical review of her claim and considered Dioquino's follow-up letter before denying her appeal. Therefore, the manner in which United handled Dioquino's STD claim indicates the insurer would have fairly considered her LTD claim. The Court weighs these considerations along with those it noted at the summary judgment phase, including that United is the entity resolving claims under both plans and that the plans' disability definitions are materially the same for the first two years of LTD benefits.

Overall, the Court finds Dioquino does not meet her burden to show that administratively pursuing an LTD claim was "doomed to fail." *See Diaz*, 50 F.3d at 1485. And because she does not show the futility exception applies, she was required to file a claim under the LTD Plan and exhaust her administrative remedies. Because she did not do so, the Court concludes judgment in favor of United and against Dioquino on her claim for LTD benefits is appropriate. *See id.* at 1483, 1486.

## B. Entitlement to Benefits

To avoid all doubt, the Court will also address the merits of Dioquino's claim for LTD benefits. On de novo review, the issue is whether Dioquino meets her burden to show that an illness prevented her from doing the Substantial and Material Acts necessary to pursue her Usual Occupation. (AR 825.) Here, that was a sedentary job as a Financial Analyst–Accountant. (AR 774.) Her key contention is that she cannot sit or stand for more than ten minutes at a time, or a total of two hours in an eight-hour workday. (Dioquino's Opening Tr. Br. 1.) Therefore, Dioquino argues she is disabled from working in a sitting position, or in any position in any occupation. (*Id.*)

A preponderance of the evidence does not support this contention. The Administrative Record shows Dioquino abruptly stopped working in August 2018 without

20cv0167

any known trauma or injury.  Yet the medical records in the Administrative Record reflect limited treatment for her ailments,  mild-to-modest clinical and diagnostic findings, and an absence of evidence reflecting efforts to obtain a greater level of care that would reasonably follow if Dioquino were as debilitated as she claims.

Objective Evidence.  Focusing initially on the objective medical evidence, this evidence is scant.  There is a lumbar spine x-ray, but this diagnostic is from 2016. (AR 459.)  No doctor certifies that Dioquino is disabled due to a spinal condition.   There is also an MRI from 2016, but, again, this was of Dioquino's spine.  (AR 456.)  Dioquino does not show this MRI is relevant to her claim of disabling knee and ankle pain.  Next, there is a foot x-ray, again from 2016.  It shows Dioquino has a heel spur, but also shows: "No fracture or dislocation.  Preserved Joint spaces. . . . No acute bone findings."  (AR 462.)  Again, however, this x-ray predates her STD claim by almost two years.

When Dioquino abruptly stopped working in 2018, she obtained an x-ray on August 29, 2018.  (AR 513.)  This x-ray shows mostly mild—at best, moderate—abnormalities. (AR 513–14 (noting "[m]ild medial and lateral compartment arthrosis" and "mild tricompartmental arthrosis").)  The physician's impression was bilateral arthritis of the knee, with a left knee joint effusion with internal derangement.  (*Id.*)  Finally, she also obtained an x-ray of her ankle in early 2019.  (AR 286–87.)  This x-ray showed no fracture or dislocation, "[m]ild diffuse soft tissue swelling around the ankle," "[n]o osseous erosion," but "[l]arge plantar and posterior calcaneal enthesophytes."  (*Id.* 286.)  The impression was "[n]o acute osseous abnormality."  (*Id.*)

Dioquino's doctors' physical examinations revealed comparable findings.  On August 23, 2018, Dr. Samadi's musculoskeletal exam noted "no deformity, normal range of motion, normal strength, [and] no joint swelling," as well as "[m]ild point tenderness of the left heel."  (AR 728.)  Dioquino's sensation was intact.  (*Id.*)  On August 29, 2018, Dr. Campbell found Dioquino's left knee had a "[m]oderate" joint effusion, "but no ecchymosis or erythema" and "[n]o deformity."  (AR 261.)  Her flexion was normal, her extension was abnormal by ten degrees, but her strength was "5/5 in all directions except

as noted." (*Id.*)  Dr. Campbell noted "[n]o swelling" in her ankle, but "a possible longitudinal tear" on the tendon.  (AR 262.)  His physical exam on November 8, 2018, was similar, where he noted no ankle swelling and assessed Achilles tendinitis of the left lower extremity, arthritis of the knee, and a left knee sprain.  (AR 447–48.)

Although this evidence supports Dioquino's diagnoses during the relevant time, the evidence does little to confirm her contention that the ailments were disabling and prevented her from sitting or standing for more than ten minutes as a time.  The Court finds this evidence is insufficient to show she is disabled under the terms of the LTD Plan.

<u>Medical Opinions</u>.  Turning to the opinions of Dioquino's physicians, "[t]he credibility of physicians' opinions turns not only on whether they report subjective complaints or objective medical evidence of disability, but on (1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions."  *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015).

 The lynchpin opinion in this case is from Dr. Campbell, Dioquino's treating occupational medicine physician.  Dr. Campbell is the only physician who submitted an Attending Physician's Statement to United in support of Dioquino's STD claim.  He certified she is disabled because she: "Needs to be able to elevate leg.  Her employer unable to accommodate . . . . Elevate leg frequently.  Unable to sit/stand/walk > 10 mins. per hour.  Needs to get up from sitting freq[uently] for stretch break."  (AR 778.)  But he left most of the certifying form blank, including the areas for diagnoses, symptoms, the date symptoms first appeared, whether Dioquino should be able to work at a future date, other remarks, and a treatment plan.  (AR 777–78.)

The Court discounts Dr. Campbell's opinion for several reasons.  First, the extent of the treatment history for Dioquino's condition was minimal.  Dr. Campbell only saw Dioquino twice for these ailments after she abruptly stopped working and before he assessed she could no longer sit or stand for more than ten minutes per hour.  (AR 259, 445; *see also* AR 259 (noting after a two year gap of not seeing Dioquino: "Patient was

thought to be coming in today for follow-up of hamstring injury, but states she is having pain to the knee and pain to the ankle region.  She has not been seen previously for these issues").)   Further, his assessment is based on Dioquino's self-reports, including the statement that Dioquino's employer was unable to accommodate her.  As mentioned, there is no evidence that Dr. Campbell ever communicated directly with Children's Medical.

Moreover, there is a lack of detail to support Dr. Campbell's conclusions.  Other than appearing to rely on Dioquino's self-reports of disabling pain, it is unclear how Dr. Campbell's diagnoses support the severe functional restrictions he included in the Attending Physician's Statement to United.  (*See* AR 449 (noting "[t]emporary disability forms filled out" after assessing Achilles tendinitis of the left lower extremity, knee arthritis, and left knee sprain).)  Finally, Dr. Campbell did not respond to any of United's follow-up inquiries seeking more information, which the Court finds undercuts his opinion in light of the other items mentioned above.  Hence, the Court concludes Dr. Campbell's conclusory assessment for Dioquino's STD claim is insufficient to carry her burden of demonstrating she is disabled under the LTD Plan.[7]

Turning to United's reviewing physicians, Dr. Smith and Dr. Hulett, they are entitled to less weight because they conducted paper reviews and did not examine Dioquino. *See Montour*, 588 F.3d at 634.  Dioquino criticizes these reviews repeatedly, but they support the conclusion that Dioquino is not disabled under the LTD Plan.  The central issue raised by Dr. Smith's and Dr. Hulett's reports is that the clinical findings are limited and simply do not justify the severe functional restrictions Dr. Campbell assessed for Dioquino. (AR 244, 422, 653–56.)  These reviewers were understandably skeptical that Dr. Campbell determined Dioquino could no longer sit, stand, or walk for more than ten minutes per hour

---

[7]   The Court notes Dr. Yarbrough submitted Physician's Certification Forms to the California Employment Development Department that contained similar limitations.  (*See* AR 171–72.)  But the one treatment note from Dr. Yarbrough in the Administrative Record notes that "[s]he sees Dr. Campbell for this," Dioquino is "[s]lowly improving with conservative measures," and she is "to follow-up with [musculoskeletal]."  (AR 267.)  Dr. Yarbrough's minimal findings and details do not change the outcome or support the severe limitations placed on Dioquino's ability to sit or stand.

after two office visits and an x-ray that revealed mild-to-moderate degenerative findings. And Dr. Campbell did not return their six phone calls about Dioquino's condition. (AR 421, 653.)

Accordingly, the Court is also unmoved by Dioquino's argument that she is "per se disabled" under *Armani v. Northwestern Mutual Life Insurance Co.*, 840 F.3d 1159 (9th Cir. 2016). There, the Ninth Circuit held the claimant was disabled under the plan's terms because there was "undisputed evidence" that the claimant "was unable to sit for more than four hours a day." *Id.* at 1164. For the reasons explained above, the Court does not accept Dr. Campbell's assessment that Dioquino is unable to sit for more than ten minutes per hour. Moreover, the underlying record in *Armani* is readily distinguishable. In over twenty treatment visits during more than two years, the claimant in *Armani* saw multiple specialists for a back injury suffered at work. The medical evidence summarized above for Dioquino is meager by comparison, and *Armani* does not compel a different outcome here.

<u>Dioquino's Statement & Conduct</u>. The Court next considers the statements Dioquino submitted with her appeal of the STD Claim. (AR 246, 586–87.) Specifically, on June 22, 2019, Dioquino wrote a narrative about her condition, symptoms, and treatment options. (AR 586.) The Court assigns this narrative minimal weight. First, because it is written by Dioquino, it presents a significant potential for bias. Second, it includes medical conclusions and statements that are not supported by the record. For example, Dioquino states an MRI "was unnecessary" because Dr. Campbell already had MRI results. (AR 587.) However, as explained above, these results were for an MRI of her spine two years prior. She also states the Rest, Ice, Compression, and Elevation ("RICE") method "would be more effective than physical therapy or a cam walker boot," but that conclusion is not found in the treatment notes summarized above. (*Id.* 586.) Overall, this statement does not persuade the Court that Dioquino meets her burden to show she is entitled to LTD benefits.

20cv0167

In the same vein, the Court finds Dioquino's decision to not at least pursue formal physical therapy casts doubt on her self-reports. "Courts discredit a plaintiff's subjective belief that she is disabled if she refuses treatment or is not diligent in following a treatment plan that could alleviate her symptoms." *See Shaw*, 144 F. Supp. 3d at 1132. Despite abruptly not being able to sit for allegedly more than ten minutes at a time, Dr. Campbell notes Dioquino "decline[d] formal physical therapy." (AR 449.) She claims pursuing this treatment option was unnecessary because she learned home exercises two years previously in connection with her prior hamstring injury. (*See* AR 149, 449, 514–15.) That explanation is not convincing.

State Disability Benefits. Last, the Court addresses Dioquino's California State Disability Insurance Benefits. Dioquino argues California's determination that she was disabled should carry significant weight. (Pl.'s Opening Tr. Br. 29.) "Although the standards used by various disability benefits programs to determine eligibility vary, the fact that a claimant is found to be entitled to disability 'benefits [under one program] . . . suggests that [she] suffers from some limitation on [her] ability to work.'" *Lukianczyk v. Unum Life Ins. Co. of Am.*, 505 F. Supp. 3d 1033, 1050 (E.D. Cal. 2020) (alterations in original) (quoting *Mossler v. Aetna Life Ins. Co.*, No. CV 13-01945 SJO (MRWx), 2014 WL 3587511, *16 (C.D. Cal. July 21, 2014)). Therefore, "the fact that a claimant has qualified for state government disability benefits is properly taken into consideration as evidence of disability but is not determinative." *Id.*

The Court assigns little weight to the fact that Dioquino received state disability benefits. California's initial determination was based on Dr. Campbell's certification. (AR 387–88.) The Administrative Record does not include reports from any independent medical examiners that may have informed California's decision. *Cf. Shaw*, 144 F. Supp. 3d at 1144 (noting claimant was awarded state benefits based in part "on the reports of three independent medical examiners"). And given the Court's assessment of Dr. Campbell's opinion above, the Court finds California's determination is not persuasive enough to tip the scales in Dioquino's favor to reach the conclusion that she is totally

20cv0167

disabled under the LTD Plan.  *See Lukianczyk*, 505 F. Supp. 3d at 1050; *Shaw*, 144 F. Supp. 3d at 1134–35.

\* \* \*

In sum, the Administrative Record does not support Dioquino's claim that the evidence "overwhelming establishes" that she was, and is, totally disabled. (Pl.'s Opening Tr. Br. 18.)  The evidence supports that she suffers from arthritis in the knees and has problems with her ankle, but it does not convincingly show she is unable to "sit/stand/walk > 10 mins. per hour." (AR 778.)  Stated differently, Dioquino does not demonstrate that she was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue" her Usual Occupation.  (*See* AR 825.)  Hence, United is entitled to judgment against Dioquino on her claim for LTD benefits.

## CONCLUSION

Based on the findings of fact and conclusions of law set forth above, judgment shall be entered in favor of Defendant United of Omaha Life Insurance Company and against Plaintiff Joni Dioquino on her claim for long-term disability benefits.  Further, for the reasons expressed in the Court's Summary Judgment Order (ECF No. 39), judgment shall be entered in favor of Defendant United of Omaha Life Insurance Company and against Plaintiff Joni Dioquino on Plaintiff's claim for short-term disability benefits.  United paid all the short-term disability benefits available, so that claim is adjudged moot.

Further, any request for attorney's fees shall be filed no later than **November 19, 2021**.  The moving memorandum for any motion shall not exceed ten (10) pages.  Any opposition shall not exceed ten (10) pages and shall be filed by **December 3, 2021**, and any reply shall not exceed five (5) pages and shall be filed by **December 10, 2021**.  Further, any request for attorney's fees must be supported with detailed billing records.

**IT IS SO ORDERED.**

**DATED: November 5, 2021**

Hon. Cynthia Bashant
United States District Judge

- 23 -

20cv0167